**FILED**

May 29, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001862548

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>JOHN D. REYNEN and JUDITH M. REYNEN,<br><br>           Debtors. | Case No.: 08-25145<br><br>Chapter 11<br><br>MLG-022 |
| In re:<br><br>CHRISTO BARDIS and SARA BARDIS,<br><br>           Debtors. | Case No.: 08-34878<br><br>Chapter 11<br><br>MHK-009 |

## DISCLOSURE STATEMENT FOR DEBTORS' <u>FIRST AMENDED JOINT PLAN OF REORGANIZATION</u>
### (Dated May 29, 2009)

MEYERS LAW GROUP, P.C.
A Professional Corporation
MERLE C. MEYERS, ESQ. CA Bar #66849
EDIE WALTERS, ESQ. CA Bar #262730
MICHELE THOMPSON, ESQ. CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, California 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515
Email: mmeyers@mlg-pc.com
      ewalters@mlg-pc.com
      mthompson@mlg-pc.com

Attorneys for Debtors John and Judith Reynen

MEEGAN, HANSCHU & KASSENBROCK
DAVID M. MEEGAN, ESQ. CA Bar #114549
11341 Gold Express Drive, Suite 110
Gold River, CA 95670
Telephone: (916) 925-1800
Facsimile: (916) 889-8359
Email: DMeegan@mhksacto.com

Attorneys for Debtors Christo and Sara Bardis

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................2

    A.    Filing of the Plan ...............................................................................2

    B.    Right to Vote on the Plan ...................................................................3

    C.    Voting Instructions............................................................................4

    D.    Confirmation Hearing ........................................................................5

II.    DESCRIPTION OF THE PLAN .................................................................6

    A.    Introduction ........................................................................................6

    B.    Classification and Treatment of Claims ...........................................6

    C.    Material Elements of the Plan ..........................................................11

        1.    Appointment of Plan Agent...............................................11

        2.    Appointment of Plan Committee.......................................12

        3.    Estates and Excluded Assets. ............................................13

        4.    Continuing Role and Compensation of Debtor Group. ....14

        5.    Continuing Role of Buildco. .............................................16

        6.    Debtor Group's Discharge and Asset Ownership. ............17

        7.    Treatment of Secured Claims, Generally .........................18

        8.    Allocation of Administrative Expenses ............................19

        9.    Treatment of Administrative Convenience Claims...........19

        10.    Treatment of General Unsecured Claims ..........................19

    D.    Recommendation as to Plan..............................................................19

III.    INFORMATION REGARDING THE CHAPTER 11 ESTATE .....................20

    A.    The Debtor Group and Their Business Interests...............................20

    B.    Events Leading to Commencement of Chapter 11 Case ...................20

IV.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE .................21

    A.    Operation of Business by Debtors-in-Possession .............................21

    B.    Appointment of Official Unsecured Creditors' Committee in the Reynen Case...22

    C.    Use of Cash During Chapter 11 Cases .............................................23

    D.    Bankruptcy Schedules and Statements of Financial Affairs.............23

    E.    Representation of the Debtor Group and the Creditors' Committee ...24

        1.    Reynen Debtors' Professionals ........................................24

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

|  |  | 2. | Creditors' Committee's Professionals | 24 |
|  |  | 3. | Bardis Debtors' Professionals | 25 |
|  | F. | Bar Date for Filing Proofs of Claim | | 25 |
|  | G. | Filing of Tax Returns and Receipt of Refunds | | 25 |
|  | H. | Forbearance Agreements | | 26 |
|  | I. | Motions for Relief from Stay and Deficiency Waivers | | 26 |
| V. | | ESTATES' ASSETS AND LIABILITIES | | 28 |
|  | A. | Reynen Estate | | 28 |
|  |  | 1. | Assets | 28 |
|  |  | 2. | Liabilities | 36 |
|  | B. | Bardis Estate | | 37 |
|  |  | 1. | Assets | 37 |
|  |  | 2. | Liabilities | 41 |
| VI. | | CONFIRMATION AND CONSUMMATION PROCEDURE | | 42 |
|  | A. | Solicitation of Votes | | 42 |
|  | B. | The Confirmation Hearing | | 42 |
|  | C. | Confirmation | | 43 |
|  |  | 1. | Acceptance | 43 |
|  |  | 2. | Unfair Discrimination and Fair and Equitable Tests | 43 |
|  |  | 3. | Feasibility | 44 |
|  |  | 4. | Best Interests of Creditors | 44 |
|  | D. | Consummation | | 47 |
|  | E. | Effect of Confirmation of the Plan | | 47 |
| VII. | | CERTAIN RISK FACTORS TO BE CONSIDERED | | 47 |
|  | A. | Certain Bankruptcy Law Considerations | | 48 |
|  |  | 1. | Risk of Non-Confirmation of the Plan | 48 |
|  |  | 2. | Non-Consensual Confirmation | 48 |
|  |  | 3. | Tax Attributes of the Plan | 48 |
|  | B. | Certain Practical Considerations | | 48 |
|  |  | 1. | Failure to Retain Tax Refunds | 48 |
|  |  | 2. | Failure of R&B's Operations | 49 |
|  |  | 3. | Estimated Amounts | 49 |
|  |  | 4. | Contested Claims | 50 |

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

5.     Liquidation Analysis ..................................................................50

VIII.    CONCLUSION AND RECOMMENDATION .................................................51

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEYERS LAW GROUP, P.C.
LAW OFFICES
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

JOHN D. REYNEN and JUDITH M. REYNEN, the debtors-in-possession in the Reynen Case (the "Reynen Debtors"),[1] and CHRISTO BARDIS AND SARA BARDIS, the debtors-in-possession in the Bardis Case (the "Bardis Debtors"), present this disclosure statement (the "Disclosure Statement") for the purpose of providing parties in interest with information pertinent to the Debtors' Joint Plan of Reorganization (as it may be amended or modified hereafter, the "Plan") filed on April 9, 2009 by the Reynen Debtors and the Bardis Debtors (collectively, the "Debtor Group") jointly.

**ALL CREDITORS AND HOLDERS OF CLAIMS AGAINST THE DEBTOR GROUP ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO, EXHIBITS TO THE PLAN AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS DISCLOSURE STATEMENT. ALL CREDITORS AND HOLDERS OF CLAIMS IN THE DEBTOR GROUP'S CASES SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.**

**THE DEBTOR GROUP BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATES AND ALL OF THEIR RESPECTIVE CREDITORS. THE PLAN IS THE PRODUCT OF EXTENSIVE AND COMPREHENSIVE NEGOTIATIONS WITH THE CREDITORS' COMMITTEE APPOINTED BY THE BANKRUPTCY COURT IN THE REYNEN CASE, AND THE CREDITORS' COMMITTEE HAS RECOMMENDED THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

**THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT, WHICH APPROVAL DOES NOT CONSTITUTE A DETERMINATION OF THE MERITS OF THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THE APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND HOLDERS OF CLAIMS IN THE DEBTOR GROUP'S ESTATES TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY, NOR HAS THE SEC OR SUCH OTHER COMMISSION OR AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

---

[1] All capitalized terms used in this Disclosure Statement, unless otherwise defined herein, are intended to have the meanings ascribed to them in the Plan.

**THE DEBTOR GROUP IS UNABLE TO WARRANT OR REPRESENT THAT ALL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN EXHIBITS ATTACHED HERETO IS WITHOUT ERROR, ALTHOUGH ALL REASONABLE EFFORTS UNDER THE CIRCUMSTANCES HAVE BEEN MADE TO BE ACCURATE. IN PARTICULAR, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTOR GROUP NOTES THAT THE ASSUMPTIONS AND PROJECTIONS REFERENCED HEREIN REGARDING FUTURE RESULTS, REVENUES AND INCOME OF THE ESTATES, AND THE TIMING AND FEASIBILITY OF DISTRIBUTIONS TO CREDITORS, ARE ONLY PREDICTIONS OF FUTURE EVENTS, AND THEREFORE THERE CAN BE NO ASSURANCES THAT THE ASSUMPTIONS WILL IN FACT MATERIALIZE OR THAT THE PROJECTED EVENTS WILL IN FACT OCCUR AS PREDICTED.**

## INTRODUCTION

### A.   Filing of the Plan

The Reynen Debtors filed their voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on April 23, 2008 (the "Reynen Petition Date") in the Bankruptcy Court.   The Bardis Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code on October 15, 2008 (the "Bardis Petition Date") in the Bankruptcy Court.   The Debtor Group has remained in possession of respective Estate assets since then, no trustee having been appointed in either case.

The Debtor Group has filed the Plan and this Disclosure Statement with the Bankruptcy Court pursuant to the provisions of Section 1125 of the Bankruptcy Code, for distribution to holders of Claims against the assets of either the Reynen Debtors, the Bardis Debtors or both, in connection with (i) the solicitation of acceptances of the Plan, and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") to be scheduled by the Bankruptcy Court.

Attached as exhibits to this Disclosure Statement are copies of the following:

- the Plan (**Exhibit "A"**);

- the Order of the Bankruptcy Court approving this Disclosure Statement and establishing voting and tabulation procedures (**Exhibit "B"**);

- the Debtor Group's projections of plan distributions and liquidation alternative in Reynen Estate (**Exhibit "C"**);

- the Debtor Group's projections of plan distributions and liquidation alternative in Bardis Estate (**Exhibit "D"**);

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

- the most recent monthly operating report filed by the Reynen Debtors (**Exhibit "E"**);

- the most recent monthly operating report filed by the Bardis Debtors (**Exhibit "F"**);

- an analysis of general unsecured claims against each of the Estates (**Exhibit "G"**)

- the curriculum vitae of Hank Spacone, the proposed Plan Agent (**Exhibit "H"**); and

- a schedule of protective prepetition transfers by the Reynen Debtors to insiders, accompanied by intended dispositions (**Exhibit "I"**).

In addition, a ballot (the "Ballot") for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement, for use by those holders of Claims that are entitled to vote to accept or reject the Plan.

After notice and a hearing, the Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor Group's creditors and interest holders to make an informed judgment whether to accept or reject the Plan. Each creditor and holder of a Claim in either the Reynen Estate or the Bardis Estate that is entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entireties before voting on the Plan.

**B.    Right to Vote on the Plan**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims in classes of claims that are impaired under the terms and provisions of a chapter 11 plan are entitled to vote to accept or reject that plan. Holders of Allowed Claims in classes of claims that are unimpaired under the terms and provisions of a chapter 11 plan are conclusively presumed to have accepted the plan and therefore are not entitled to vote with respect to that plan. Holders of Claims within Classes A1, A2, B1.1, B1.12, B2.1, B2.2, B2.3, B2.5, B2.8 and B2.9 of the Plan are unimpaired, are conclusively presumed to have accepted the Plan, and therefore do not have the right to vote on the Plan. Holders

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

of Claims in Classes B1.2, B1.3, B1.4, B1.5, B1.6, B1.7, B1.8, B1.9, B1.10, B1.11, B2.4, B2.6, B2,7, C1, C2, D1 and D2 are impaired and therefore are entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount, and more than one-half in number, of claims within that class that cast ballots for acceptance or rejection of the plan. The Bankruptcy Code defines "acceptance" of a plan by a class of interests as acceptance by interest holders in that class that hold at least two-thirds in amount of the allowed interests in that class that cast ballots for acceptance or rejection of the plan. For a more complete description of the requirements for confirmation of the Plan, see Section VI, "Confirmation and Consummation Procedure."

If a Class of Claims rejects the Plan or is deemed to reject the Plan, the Debtor Group has the right, and intends, to request confirmation of the Plan pursuant to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or equity interests if the proponent thereof complies with the provisions of that section. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VI(B)(2), "Confirmation and Consummation Procedure -- Unfair Discrimination and Fair and Equitable Tests."

The Debtor Group believes that through the Plan, creditors will obtain a greater recovery upon their claims than the recovery that would be available if the assets of the Debtor Group were liquidated under chapter 7 of the Bankruptcy Code. Therefore, the Debtor Group believes that after carefully reviewing the Plan and this Disclosure Statement, including the Exhibits, each holder of an Allowed Claim that is entitled to vote with respect to the Plan should vote to accept the Plan. As noted above, the Official Creditors' Committee appointed in the Reynen Case (the "Committee" or the "Creditors' Committee"), having negotiated at length with the Debtor Group on behalf of general unsecured creditors, supports the confirmation of the Plan.

C. **Voting Instructions**

If you are entitled to vote to accept or reject the Plan, the Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you may submit separate ballots that must be used for each separate Class of Claims. In any event, please vote and return your ballot(s) to:

REYNEN PLAN OF REORGANIZATION
c/o Meyers Law Group, P.C.
Attn: Edie Walters, Esq.
44 Montgomery Street, Suite 1010
San Francisco, CA 94104

DO NOT RETURN YOUR NOTES OR SECURITIES WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE STATED ON THE BALLOT.

If you are entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Edie Walters, Esq., one of the Debtor Group's counsel, at (415) 362-7500, ext. 225.

**D. Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be commenced on the date set forth in documents provided with this Disclosure Statement before the Honorable Christopher M. Klein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, 501 "I" Street, Sacramento, California. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before the deadline stated in such documents, in the manner described below in Section VI(B), "Confirmation and Consummation Procedure -- The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**A.     Introduction**

The Plan is the product of extensive efforts by the Debtor Group to formulate a plan that maximizes recoveries for creditors and provides for distributions to creditors to be made as early as possible.  It is also the product of successful and detailed negotiations with the Creditors' Committee.  Those negotiations consumed many months of laborious discussions and analyses among the Committee, the Debtor Group, related entities and their respective counsel and financial advisors.  Many iterations of an extensive and comprehensive term sheet were exchanged and debated among the parties, supported by extended research and analysis by the Committee's financial advisor and consideration of multiple issues and competing interests, and in the end, the Committee and the Debtor Group were able to reach agreement upon the terms of the Plan so that it can proceed with the full support of both, in a manner intended to maximize recoveries for creditors of both Estates.  Based upon those successful negotiations, this Disclosure Statement is accompanied by a letter sent on behalf of the Committee expressing its full and strong support for the Plan and urging creditors holding general unsecured claims to timely accept the Plan through use of the enclosed Ballot.

Under the Plan, the Debtor Group estimates that the Plan Agent will pay between approximately 2.8% and approximately 6.1% of all Allowed General Unsecured Claims in the Reynen Case, and between approximately 2.2% and approximately 5.2% of all Allowed General Unsecured Claims in the Bardis Case, over time, using the proceeds of the Debtor Group's tax refunds, as well as cash generated by the sale of most of the Debtor Group's non-exempt assets and the recovery of avoidable transfers, as explained in more detail below.  The Debtor Group's ability to preserve the value of the estate is premised on the ability to retain tax refunds and on substantial cooperation and efforts by the Debtor Group that have been made during the course of the Chapter 11 Cases and will continue to be made throughout the remainder of the cases, with post-confirmation incentive compensation paid to the Debtor Group pursuant to formulae as negotiated with the Creditors' Committee.

**B.     Classification and Treatment of Claims**

The Plan designates approximately 30 Classes of Claims (including subclasses).  Those

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Classes take into account the differing nature and priority of the various classified Claims under the Bankruptcy Code.

The following table briefly summarizes the classification and treatment of all Claims under the Plan and the consideration distributable on account of such Claims under the Plan. The information set forth in the following table is for convenience of reference only, and each holder of a Claim should refer to the Plan for a full understanding of the classification and treatment of Claims provided for under the Plan. Claims will receive designated treatment within a Class only to the extent Allowed within that class. The Claim allowance procedure is an ongoing process and the actual amount of Allowed Claims may vary from the estimates. For a complete description of the risks associated with the recoveries provided under the Plan, see Section VII, "Certain Risk Factors To Be Considered."

| **CLASS** | **CLAIMS** | **SUMMARY OF TREATMENT** |
|---|---|---|
| Nonclassified | Reynen Administrative Expenses | Paid in full by Plan Agent on latest of (a) Effective Date; (b) when due or such later date as approved by the claimant; or (c) when allowed by Final Order. |
| Nonclassified | Reynen Priority Tax Claims | Paid in full by Plan Agent in up to four equal, annual payments, with interest at applicable nonbankruptcy rate |
| Nonclassified | Bardis Administrative Expenses | Paid in full by Plan Agent on latest of (a) Effective Date; (b) when due or such later date as approved by the claimant; or (c) when allowed by Final Order. |
| Nonclassified | Bardis Priority Tax Claims | Paid in full by Plan Agent in up to four equal, annual payments, with interest at applicable nonbankruptcy rate |
| Class A1 | Reynen Priority Claims | Paid in full by Plan Agent on latest of (a) Effective Date; (b) when due or such later date as approved by the claimant; or (c) when allowed by Final Order. |
| Class A2 | Bardis Priority Claims | Paid in full by Plan Agent on latest of (a) Effective Date; (b) when due or such later date as approved by the claimant; or (c) when allowed by Final Order. |

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

| CLASS | CLAIMS | SUMMARY OF TREATMENT |
|-------|--------|----------------------|
| Class B1.1 | Silver Oak Reynen Secured Claim | Permitted to foreclose on its collateral immediately following the Effective Date. |
| Class B1.2 | AKT Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.3 | Bank of America-Sacramento Secured Claim | Paid monthly interest by the Reynen Debtors at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Reynen Debtors, with rights to seek early relief and lien retention. |
| Class B1.4 | CBT Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.5 | Chase Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.6 | Merrill Lynch Secured Claim | Paid monthly interest by the Reynen Debtors at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Reynen Debtors, with rights to seek early relief and lien retention. |
| Class B1.7 | PNB Secured Claim | Paid monthly interest by the Reynen Debtors at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Reynen Debtors, with rights to seek early relief and lien retention. |
| Class B1.8 | Wells-Wallace Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.9 | Wells-Mendocino Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

| CLASS | CLAIMS | SUMMARY OF TREATMENT |
|-------|--------|----------------------|
| Class B1.10 | Wells-Truckee Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.11 | Wells-Reno Secured Claim | Paid monthly interest by Plan Agent at the rate of 5% for twelve months, subject to abandonment or reinstatement by the Plan Agent, with rights to seek early relief and lien retention. |
| Class B1.12 | All other Reynen Secured Claims | At the election of the Plan Agent, either fully cured and reinstated, or paid in full, or allowed to foreclose upon collateral. |
| Class B2.1 | ATAP Secured Claim | Permitted to foreclose on its collateral immediately following the Effective Date. |
| Class B2.2 | Silver Oak Bardis Secured Claim | Permitted to foreclose on its collateral immediately following the Effective Date. |
| Class B2.3 | Wachovia-Gold River Secured Claim | All arrearages owing to secured creditor will be cured and the underlying loan will be fully reinstated by the Reorganized Bardises. |
| Class B2.4 | Wachovia-L.A. Secured Claim | Permitted to foreclose on its collateral immediately following the Effective Date. |
| Class B2.5 | Bank of West-Gold River Secured Claim | Unless the Reorganized Bardises commence a motion or complaint to avoid and disallow the claim within thirty (30) days following the Effective Date, the holder of the Allowed Secured Claim will be permitted to exercise nonbankruptcy law remedies. |
| Class B2.6 | BankFirst-Gold River Secured Claim | Unless the Reorganized Bardises commence a motion or complaint to avoid and disallow the claim within thirty (30) days following the Effective Date, the holder of the Allowed Secured Claim will be permitted to exercise nonbankruptcy law remedies. |
| Class B2.7 | First Tennessee Secured Claim | Unless the Reorganized Bardises commence a motion or complaint to avoid and disallow the claim within thirty (30) days following the Effective Date, the holder of the Allowed Secured Claim will be permitted to exercise nonbankruptcy law remedies. |

| CLASS | CLAIMS | SUMMARY OF TREATMENT |
|-------|--------|----------------------|
| Class B2.8 | BankFirst-Pebble Proceeds Secured Claim | To the extent that any Secured Claim within this Class is asserted and allowed by a Final Order, the holder thereof will be permitted to exercise nonbankruptcy law remedies. |
| Class B2.9 | All other Bardis Secured Claims | At the election of the Plan Agent, either fully cured and reinstated, or paid in full, or allowed to foreclose upon collateral. |
| Class C1 | Reynen Convenience Claims ($2,500 or less) | Payment by Plan Agent equal to 5% of Allowed Claim, on latest of (a) Effective Date or (b) when claim becomes Allowed, with right to opt in to, or out of, class. |
| Class C2 | Bardis Convenience Claims ($2,500 or less) | Payment by Plan Agent equal to 5% of Allowed Claim, on latest of (a) Effective Date or (b) when claim becomes Allowed, with right to opt in to, or out of, class. |
| Class D1 | Reynen Unsecured Claims | Payments by Plan Agent from time to time on a pro rata basis as funds permit, from the net proceeds of asset sales, avoidance recoveries and income tax refunds. Estimated to be between approximately 2.8% and approximately 6.1% of allowed amounts in the aggregate. |
| Class D2 | Bardis Unsecured Claims | Payment by Plan Agent from time to time on a pro rata basis as funds permit, from the net proceeds of asset sales, avoidance recoveries and income tax refunds. Estimated to be between approximately 2.2% and approximately 5.2% of allowed amounts in the aggregate. |
| Class E1 | Reynen Equity Interests | Reynen Debtors will receive the Reynen Excluded Assets as of the Effective Date, and shall be entitled to certain incentive payments as described in Section II(C)(4) below. |
| Class E2 | Bardis Equity Interests | Bardis Debtors will receive the Bardis Excluded Assets as of the Effective Date, and shall be entitled to certain incentive payments as described in Section II(C)(4) below. |

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

## C. Material Elements of the Plan

The following is a brief summary of certain of the material provisions of the Plan that allow for the distributions and treatments contemplated by the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan itself, a copy of which is annexed hereto as **Exhibit "A,"** as well as financial and other information contained elsewhere in this document and in the exhibits attached hereto.

**1. Appointment of Plan Agent.** On and after the Effective Date, a Plan Agent, selected by the Creditors' Committee and the Debtor Group, will direct the liquidation of the Estates' assets and to oversee the buildout of certain existing projects. The Plan Agent will obtain a fidelity bond at the Estates' expense, shall be independent of all other interests in the cases, and must have sufficient business experience to make knowledgeable business judgments related to the implementation of the Plan. The Plan Agent may be removed and replaced by the Plan Committee, with the reasonable approval of the Reorganized Debtors.

The Creditors' Committee and the Debtor Group have selected Hank Spacone for the role of Plan Agent, and Mr. Spacone has agreed to be retained in that capacity. Therefore, subject to the occurrence of the Effective Date, Mr. Spacone will act as the Plan Agent and will be assisted by his staff, including the following individuals, at the following hourly rates: $250.00 per hour for Mr. Spacone; $125.00 per hour for Marsha Kass; $100.00 per /hour for Chris Barlow; and $60.00 per hour for Pamela Henderson. Pending the Effective Date, Mr. Spacone has been retained by the Creditors' Committee as its consultant, so that once the Plan becomes effective, there will be no time lost in familiarizing the Plan Agent with the assets and liabilities of the Estates that he will administer.

Mr. Spacone has been selected for his expertise, experience and proven ability, based in part upon the following: Mr. Spacone is a licensed and practicing certified public accountant with over 25 years of experience. He has served as a chapter 7 and chapter 11 bankruptcy trustee in both the Northern and Eastern Districts of California. Mr. Spacone has provided consulting services to corporate and individual clients covering many industries. He has extensive experience in complex corporate reorganization and bankruptcy liquidations. Mr. Spacone has also had experience in

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

developing financial structuring for public/private partnership projects through private placements and public offerings. Attached hereto as **Exhibit "H"** is Mr. Spacone's curriculum vitae.

The Plan Agent will commence services as of the Effective Date, and will continue to perform his duties until completion of the final distribution to be made in implementation of the Plan, or until removed pursuant to the terms of the Plan. The Plan Agent will act in each of the Reynen Case and the Bardis Case, and will keep separate accounts, books and records for each of the Estates. The Plan Agent will be responsible for the implementation of the Plan to the extent expressly provided in the Plan, and will have certain duties, powers and authorities in order to do so, including the ability to monitor and direct, in defined respects, the assistance efforts of the Debtor Group, full access to the books and records of Buildco (see Section II(C)(5) below for a description of this entity and its role under the Plan), the ability to negotiate settlements and to sell assets on behalf of the Estates, the power to file and prosecute Estate avoidance claims and objections to Claims, in accordance with the terms of the Plan, and the responsibility to make distributions to creditors from time to time and to manage the Estates' funds in the interim. The Plan Agent also will be responsible for making expenditures on behalf of the Estates, including maintaining insurance coverage and paying the approved administrative expenses of Plan implementation.

The Plan Agent is also responsible for making advances to Buildco in accordance with a budget approved by the Creditors' Committee and R&B, subject to modification in certain circumstances. As discussed below, the continued, limited operation of Buildco is considered by both the Debtor Group and the Creditors' Committee to be beneficial to the Estates herein, given the likely reduction of unsecured guarantee claims in these cases that will result from Buildco's completion of existing construction projects.

2. **Appointment of Plan Committee.** A Plan Committee will be formed as of the Effective Date in order to monitor the activities of the Plan Agent and the Debtor Group, and to provide or withhold consents to certain actions by each. There will be either three or five members of the Plan Committee, all of whom will be holders of Claims within Classes D1 or D2 selected by the Creditors' Committee and approved by the Court. Members shall be compensated and reimbursed their expenses, and each member and its representative shall be indemnified by the Estates against

any claims against them other than for gross negligence or intentional misconduct. In addition, to the extent reasonably available, the Plan Agent will purchase errors and omissions insurance coverage for such members (as well as for the Plan Agent and, within certain limitations, the Debtor Group).

To date, subject to Bankruptcy Court approval, the following creditors have agreed to become members of the Plan Committee: Wells Fargo Bank, N.A., Guaranty Bank and Lennar Renaissance, Inc. Each of those creditors holds claims against both the Reynen Estate and the Bardis Estate. It is anticipated that two more members may be asked to serve on the Plan Committee. Members will be reimbursed their expenses in serving on the Plan Committee, plus an attendance fee for each meeting of the Plan Committee attended.

**3.** **Estates and Excluded Assets.** As of the Effective Date, all assets of the two Estates shall remain in those Estates and be managed by the Plan Agent, except for certain properties (the "Excluded Assets") that will be revested in the Reorganized Debtors. Those Excluded Assets, in general, are either exempt from creditors' claims as a matter of law or considered to have limited equity or recovery value. The Excluded Assets are as follows:

- <u>Reynen Excluded Assets</u>: Pursuant to the terms of the Plan, the following assets will be revested in the Reynen Debtors on the Effective Date and will not be subject to liquidation or creditor claims:

  o <u>Sacramento Property</u> – The Reynen Debtors' residence, located at 2400 E. Tiffany, Sacramento, California.

  o <u>Pennsylvania Farm</u> – The Reynen Debtors' house, land and quarry, together with related interests and assets, located in Hartford Pennsylvania.

  o <u>Personal Items</u> – All household goods, vehicles, jewelry, artwork, clothing and other personal items of the Reynen Estate.

  o <u>Mercedes Vehicle</u> – A 2007 Mercedes Benz vehicle.

- <u>Bardis Excluded Assets</u>: Pursuant to the terms of the Plan, the following assets will be revested in the Bardis Debtors on the Effective Date and will not be subject to liquidation or creditor claims:

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

o     <u>Kastanitsas Property</u> – The Bardis Debtors' house and related property in Kastanitsas, Greece.

o     <u>Personal Property</u> – All household goods, vehicles, jewelry, artwork, clothing and other personal items of the Bardis Estate.

o     <u>C&S Partnership</u> – The Bardis Debtors' interest in C&S Partnership, a partnership that owns horses and buys, trains and sells those horses.

o     <u>Private Club Memberships</u> – Any private club memberships owned by the Bardis Estate as of the Bardis Petition Date.

o     <u>Gold River Property</u> – The Bardis Debtor's primary residence, located at 11375 Huntington Village Lane, Gold River, CA 95670.

**4.**     **<u>Continuing Role and Compensation of Debtor Group.</u>** Following the Effective Date, the Debtor Group will make reasonable best efforts to provide assistance to the Plan Agent in five respects: (a) assistance in the Plan Agent's efforts to sell the Estates' assets for the benefit of creditors, for an approximate one-year sale period; (b) the potential defense of the Estates' income tax refunds recently obtained; (c) operation of Buildco in order to complete certain development or construction projects as to which the Debtor Group has provided personal guarantees, and thereby reduce deficiency claims asserted against the Estates; (d) review of claims filed against the Estates, and prosecution of claims objections to the extent appropriate and approved by the Plan Agent; and (e) assist in the prosecution of avoidance and other claims held by the Estates.

In consideration of those efforts, the Debtor Group will be compensated as follows, subject to suspension by the Plan Agent in certain circumstances set forth in the Plan. It is the view of the Debtor Group and the Committee that the compensation provided to the Debtor Group will not materially reduce the net distributions to creditors, and will in fact substantially benefit the two estates and enhance creditors' distributions significantly, through the Debtor Group's assistance in maximizing recoveries and minimizing claims. The forms of compensation provided under the Plan are as follows:

•     <u>Sale Period Compensation.</u> As compensation for their assistance in the Plan Agent's sales efforts, the Reynen Debtors and the Bardis Debtors will each receive monthly

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA  94104

payments of $30,000 per month from May 1, 2009 to December 31, 2009, and $15,000 per month from January 1, 2010 to May 31, 2010, up to a maximum amount of $315,000 for the Reorganized Reynens and $315,000 for the Reorganized Bardises, all subject to extension and/or increase only with the consent of the Debtor Group, the Plan Agent and the Plan Committee, and also subject to offset by certain living expenses of the Debtor Group, and the holding costs of Excluded Assets (described below) incurred and paid by the Estates on or after May 1, 2009.

- • Claim Reduction Incentives. As compensation for their assistance in claims reductions, both through claims reviews and objections and through the ongoing operations and buildouts by Buildco, the Debtor Group will receive, collectively, incentive payments measured by the actual reductions of claims achieved, on a claim by claim basis (with certain exceptions and limitations, but not offset by claims allowed in amounts greater than contemplated). Reductions will be measured against a claim list agreed upon between the Creditors' Committee and the Debtor Group that sets forth their collective estimation of the likely outcome of those claims in a chapter 7 liquidation. To the extent that those claims are allowed in amounts that are less than

| Deficiency Reduction Amt | Cumulative Deficiency Reduction | % Paid | Dollars in Thousands | | |
|---|---|---|---|---|---|
| | | | Dollar Amount Range | Step Incentive | Cumulative Incentive |
| First $10,000 | $10,000 | 0.00% | $0 | $    - | $    - |
| Next 15,000 | 25,000 | 1.00% | 0 to 150 | 150 | 150 |
| Next 25,000 | 50,000 | 1.50% | 0 to 375 | 375 | 525 |
| Next 25,000 | 75,000 | 2.25% | 0 to 563 | 563 | 1,088 |
| Next 25,000 | 100,000 | 3.00% | 0 to 750 | 750 | 1,838 |
| Next 25,000 | 125,000 | 4.50% | 0 to 1,125 | 1,125 | 2,963 |
| Next 25,000 | 150,000 | 6.00% | 0 to 1,500 | 1,500 | 4,463 |

would have occurred in a chapter 7 liquidation (or in some specified cases, to the extent that particular components of claims are reduced by greater recoveries from collateral), the Estates, and therefore the Debtor Group, will benefit. The percentages and fees derived from those reductions will be calculated according to the following

Claim Reduction Table:

- <u>Tax Refund Incentives</u>.  As consideration for both the pre-Effective Date filing and prosecution of the Estates' tax returns, and the post-Effective Date potential defense of substantial tax refunds recently received, the Debtor Group will earn compensation based upon the extent of those refunds, to the extent finally resolved with the Internal Revenue Service or by the Bankruptcy Court, as follows:

  o  <u>Reynen Debtors</u>.  For the Reynen Debtors, zero percent (0%) for net refunds arising from the Reynen Estates' tax returns equal to or below $7,000,000; five percent (5%) of such net refunds between $7,000,001 and $15,000,000, inclusive; and eleven percent (11%) of such net refunds over $15,000,000.

  o  <u>Bardis Debtors</u>.  For the Bardis Debtors, zero percent (0%) for net refunds arising from the Bardis Estates' tax returns equal to or below $10,500,000; five percent (5%) of such net refunds between $10,500,001 and $18,500,000, inclusive, less $397,460 from such five percent, and eleven percent (11%) of such net refunds over $18,500,000.

## 5.  <u>Continuing Role of Buildco.</u>

R&B is a construction company that for years has been the primary entity through which the Debtor Group conducted their real estate construction and development business.  The staff of R&B has traditionally handled all administrative, financial and management functions for that business, and that staff is intimately familiar with all pending projects of subsidiary special purpose entities ("SPEs"), construction loans connected therewith, and tax returns and refunds related to the projects and to the business generally.  In February 2009, the core of that staff moved to a newly established construction management firm, Buildco, Inc., a California corporation (collectively with R&B, "Buildco"), and R&B's operations have been substantially reduced or terminated.  The expertise of that staff is essential to the maximization of distributions to the Estates' creditors, in defending the tax refunds recently received by the Estates, in reducing deficiency claims by completing ongoing projects of the SPEs, in assisting in the prosecution of avoidance claims, and in reviewing and challenging filed claims as necessary.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA  94104

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Under the Plan, Buildco, Inc. will continue to operate after the Effective Date in order to finish pending construction projects commenced by certain SPEs and to maximize recoveries by those SPEs' lenders, thereby reducing deficiency claims that will be asserted against the Reynen and Bardis Estates. Buildco, Inc. and its staff will also assist, along with the Debtor Group, in defending the tax refunds obtained by the Estates. The Plan Agent will provide funding to Buildco from the Estates for those purposes, in accordance with a budget prepared by Buildco and approved by the Creditors' Committee, and subject to modifications in certain circumstances.

Buildco will be limited in their uses of funds advanced by the Plan Agent. For example, the entities will be prohibited from using advanced funds (or in the case of the new entity, Buildco, Inc., any funds) for any "hard" construction costs, unless reasonably approved by the Plan Agent. The buildouts are expected to be completed by the end of 2009, unless such deadline is extended with the consent of the Plan Agent, after which it is expected that R&B or Buildco, Inc., as the case may be, will wind down its operations and close.

## 6.     Debtor Group's Discharge and Asset Ownership.

Pursuant to the provisions of Section 1141 of the Bankruptcy Code, each of the Reynen Debtors and the Bardis Debtors shall be discharged of all Claims against them as existing as of the Effective Date. The Claims will be discharged regardless of whether they are asserted against either of the Estates, and notwithstanding allowance or disallowance in the Chapter 11 Cases. Such discharge will become effective on December 31, 2009, and the discharge language of the Plan will also be contained in the Confirmation Order. The confirmation process and notice of the Confirmation Hearing will constitute full notice and opportunity for hearing with respect to such discharge terms, for purposes of Section 1141(d)(5)(A) of the Bankruptcy Code. All assets acquired or owned by the Debtor Group as of or after the Effective Date, including without limitation the Excluded Assets, any compensation paid to them by the Plan Agent in accordance with the terms of the Plan, and any income from any other services or investments accrued or made after the Effective Date, shall not be property of the Estates herein, and shall not subject to any Claims against the Estates.

1  **7.** **Treatment of Secured Claims, Generally.** All Secured Claims will be treated in one

2  of the following manners:

3  • Unimpaired Claims. The holders of Allowed Secured Claims within the following

4  classes will be permitted to foreclose on underlying collateral or the Allowed Secured

5  Claim will be reinstated upon the Effective Date, and those Claims are therefore

6  unimpaired: B1.1, B1.12, B2.1, B2.2, B2.3, B2.4, B2.8 and B2.9.

7  • Impaired Claims Encumbering Estate Assets. The holders of Allowed Secured Claims

8  within the following classes, whose liens encumber Estate assets, will be paid interest

9  at 5% per annum by the Plan Agent for one year, unless earlier abandoned or sold:

10  B1.2, B1.4, B1.8, B1.9, B1.10 and B1.11. Thereafter, the Claims will be reinstated

11  and cured, or the holders will be permitted to foreclose on underlying collateral.

12  • Impaired Claims Encumbering Excluded Assets. The holders of Allowed Secured

13  Claims within the following classes, whose liens encumber Excluded Assets, will be

14  paid interest at 5% per annum by the Reorganized Reynens or the Reorganized

15  Bardises, as the case may be, for one year, unless earlier abandoned or sold: B1.3,

16  B1.5, B1.6, B1.7 and B2.8. Thereafter, the Claims will be reinstated and cured, or the

17  holders will be permitted to foreclose on underlying collateral, except as to Class

18  B2.6, as described below.

19  • Potentially Avoidable Claims Encumbering Excluded Assets. The Secured Claims

20  within Classes B2.5, B2.6 and B2.7, to the extent otherwise valid, impair the Bardis

21  Debtors' homestead exemption with respect to the Gold River Property, the Bardis

22  Debtors' primary residence. Therefore, the Reorganized Bardises will be entitled to

23  file and serve a motion or complaint for avoidance, disallowance or modification of

24  such Secured Claims pursuant to Section 522(f) of the Bankruptcy Code or any other

25  provision of law within thirty (30) days following the Effective Date. If they fail to do

26  so, or if such motion or complaint is timely filed but ultimately unsuccessful, the

27  holder of the Allowed Secured Claims within Classes B2.5, B2.6 and B2.7 shall be

28  permitted to exercise its right, if any, to foreclose upon the Gold River Property.

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

- Other Secured Claims. Other Allowed Secured Claims, unknown to the Debtor Group as of the present and classified as a precaution in Classes B1.12 and B2.9, will not be impaired, and shall be reinstated, abandoned or paid in full, at the Plan Agent's election.

**8.     Allocation of Administrative Expenses**

Pursuant to Section 3.5 of the Plan, administrative expenses incurred by one of the Estates for the mutual benefit of both Estates, such as professional fees incurred in the negotiations and preparation of the Plan jointly for both Estates, will be allocated fairly between the Estates by the Plan Agent, upon notice and opportunity for hearing provided to the Plan Committee, the Reorganized Debtors and the United States Trustee.

**9.     Treatment of Administrative Convenience Claims**

Under the Plan, all unsecured claims of $2,500.00 or less, and all unsecured claims voluntarily reduced to that amount, shall be paid at the rate of five percent (5.0%) of allowed amounts on the Effective Date or upon allowance, whichever is later, provided that holders of claims within such limit may choose to "opt out" of such treatment in favor of treatment of general unsecured claims within Classes D1 and D2, or to "opt in" to such treatment by reducing their claims to the threshold amount.

**10.    Treatment of General Unsecured Claims**

General unsecured claims within Classes D1 and D2, consisting of all unsecured claims against the Reynen Debtors and the Bardis Debtors, respectively, that are not classified within other classes, shall be paid on a pro rata basis by the Plan Agent from funds of the respective Estates, from time to time as funds permit. It is anticipated, strictly as estimated projections subject to all of the uncertainties and risks attendant to projections generally and as described elsewhere herein, that the aggregate distribution to creditors within Class D1 (Reynen Unsecured Claims) will be between approximately 2.2% and approximately 6.1%, and that the aggregate distribution to creditors within Class D2 (Bardis Unsecured Claims) will be between approximately 2.2% and approximately 5.2%.

**D.     Recommendation as to Plan**

THE DEBTOR GROUP BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO HOLDERS OF ALL CLAIMS, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS. THE DEBTOR GROUP THEREFORE RECOMMENDS ACCEPTANCE OF THE PLAN BY ALL PARTIES IN INTEREST. THE CREDITORS' COMMITTEE APPOINTED IN THE REYNEN CASE ALSO BELIEVES THAT THE PLAN PROVIDES THE BEST AND EARLIEST RECOVERY FOR HOLDERS OF GENERAL UNSECURED CLAIMS IN THE REYNEN CASE, AND THEREFORE RECOMMENDS ACCEPTANCE OF THE PLAN BY ALL SUCH HOLDERS.

## III.    INFORMATION REGARDING THE CHAPTER 11 ESTATE

The following information is provided in summary form with respect to the Debtor Group, their chapter 11 estates, and related topics:

## A.    The Debtor Group and Their Business Interests

The Debtor Group's principal business enterprise is real estate development, through ownership interests held by John D. Reynen and Christo Bardis in several corporations and more than 110 special purpose entities, primarily limited liability companies, the SPEs. One of those corporations is R&B, or Reynen & Bardis Communities, Inc., a California corporation owned 50% by John Reynen and 50% by Christo Bardis. Most of the SPEs were formed for specific projects related to building homes or developing land, with financing provided by institutional lenders. Most or all of the loans made by those lenders to the SPEs have been personally guaranteed by John Reynen and Christo Bardis. Subsequently, in many instances, the SPEs transferred their properties and loans (by consensual assumptions) to corporations owned in part or in full by the Debtor Group, including R&B.

The Debtor Group's business was very successful for years, building thousands of homes in Northern California and Nevada. In the process, the Debtor Group guaranteed hundreds of construction loans and, upon completion of projects, repaid those loans and discharged their guarantee obligations.

## B.    Events Leading to Commencement of Chapter 11 Case

Unfortunately, as a result of the severe downturn in the housing market and dramatic decline

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

in home values in 2007 and 2008, many of the SPEs became insolvent and defaulted in their obligations to their respective lenders. This, in turn, placed the Debtor Group in jeopardy of owing substantial debts under personal guarantees for deficiencies in recoveries by the lenders to those SPEs, on loans having an aggregate balance of more than $900 million. Whereas the Debtor Group was able to work cooperatively with most of those lenders in order to complete projects and maximize lenders' recoveries (and thereby reduce personal guarantee exposures), certain of those lenders chose to pursue collection actions against the Debtor Group, putting at risk the Debtor Group's assets that would otherwise be available for distributions to all creditors. One lender in particular, the Bank of the West, brought suit against both John Reynen and Christo Bardis in order to enforce personal guarantees, and in January 2008, obtained prejudgment writs of attachment against their personal assets.

In order to prevent the Bank of the West's prejudgment writs from becoming permanent liens upon the Reynen Debtors' assets, therefore, and in order to prevent other collection actions that would harm creditors as a whole, the Reynen Debtors filed their voluntary petition to commence their chapter 11 case on April 23, 2008. The Reynen Debtors then commenced negotiations with the Creditors' Committee in order to reach agreement on a consensual reorganization plan. The Bardis Debtors filed their own voluntary petition on October 15, 2008 in order to facilitate an overall reorganization of their obligations in conjunction with the Reynen Debtors' reorganization efforts.

As set forth in the schedules of assets and liabilities filed by the Debtor Group in these cases, the claims against the Debtor Group's estates, including claims of the SPEs' lenders under personal guarantees, may range from hundreds of millions of dollars to almost one billion dollars, depending on the outcome of the SPEs' construction and sale programs, among other contingent variables. The Estates' assets have been valued between $50 million and $70 million, depending on methods of valuation and the outcome of the recently received tax refunds.

## IV. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

The following is a brief description of some of the major events that have occurred during the Chapter 11 Cases.

### A. Operation of Business by Debtors-in-Possession

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Since the commencement of their respective Chapter 11 Cases, the Reynen Debtors and the Bardis Debtors have managed their assets as debtors-in-possession under the protection of the Bankruptcy Court, pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An immediate effect of the commencement of the Chapter 11 Cases was the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all prepetition litigation against, and efforts to collect funds from, the Debtor Group or its property, including threatened actions by banks to foreclose upon assets of the Debtor Group. This injunction remains in effect unless and until modified or lifted by order of the Bankruptcy Court.

The Debtor Group has used this respite from debt collection to restructure its obligations and business operations, through negotiations with the SPEs' lenders and with the Creditors' Committee. In that regard, the Debtors have negotiated with lenders to complete buildouts of existing unfinished projects, as described further in Section IV(H) below, which discusses the forbearance agreements entered into after the Reynen Petition Date. The Reynen Debtors have also negotiated with secured creditors who filed motions for relief from the automatic stay to reach compromises under which associated deficiency claims would be waived, as explained in more detail in Section IV(I) below, which discusses stay relief motions.

**B.**     **Appointment of Official Unsecured Creditors' Committee in the Reynen Case**

On May 5, 2008, the United States Trustee appointed the Creditors' Committee in the Reynen Case, pursuant to the provisions of Sections 1102(a)(1) and 1102(b)(1) of the Bankruptcy Code, to represent the interests of general unsecured creditors of the Reynen Debtors. At the time of reaching agreement with the Debtor Group with respect to the terms of the Plan, the Creditors' Committee had seven members, each of which held substantial unsecured claims. Currently, four of those members, each of which holds a large unsecured claim, remain, as follows:

| | |
|---|---|
| Guaranty Bank<br>Attn: Clifford D. Ogle<br>8333 Douglas Ave.<br>Dallas, TX 75225 | Wells Fargo Bank, N.A.<br>Attn: Pat Mooney<br>2030 Main Street, Suite 800<br>Irvine, CA 92614 |
| Comerica Bank MC 4841<br>Attn: Hisashi Takiguchi | Lennar Renaissance, Inc.<br>Attn: Brian Brombeck |

| 333 W. Santa Clara St. | 25 Enterprise |
| San Jose, CA 95113 | Aliso Viejo, CA 92656 |

No creditors' committee has been appointed in the Bardis Case. However, because most of the general unsecured creditors of the Reynen Estate are also general unsecured creditors of the Bardis Estate, it is the Debtor Group's belief that negotiations with the Creditors' Committee, even though appointed only in the Reynen Case, have produced Plan terms that are in the best interests of creditors of both Estates.

## C.     Use of Cash During Chapter 11 Cases

The Reynen Debtors had approximately $1,168,000 in cash on hand as of the Reynen Petition Date. Since that date, those funds have been used for operating purposes, including advances and reimbursements made to R&B, and payments of approved interim compensation payable to the Creditors' Committee's professionals (all with the approval of the Creditors' Committee and, where necessary, the approval of the Bankruptcy Court). In addition, those funds have been increased by approximately $2,966,000 in distributions from entities that have no debt and which are owned by the Reynen Debtors, and by approximately $24,467,000 in income tax refunds received from the Internal Revenue Service. As a result, the Reynen Estate's cash on hand as of February 28, 2009 was approximately $26,863,000.

The Bardis Debtors had approximately $268,000 in cash on hand as of the Bardis Petition Date. Since that date, those funds have been used for operating purposes, and have been increased by the receipt of income tax refunds in the amount of $32,724,000 and other receipts of approximately $115,000. The Bardis Estate's cash on hand as of February 28, 2009 was approximately $32,750,000.

All of the aforementioned income tax refunds received by the Reynen Debtors and the Bardis Debtors are subject to disgorgement to the Internal Revenue Service if the latter successfully challenges the Debtor Group's income tax returns that resulted in those refunds. The Debtor Group has not yet reached agreement with the Internal Revenue Service as to any such challenge.

## D.     Bankruptcy Schedules and Statements of Financial Affairs

On May 23, 2008, the Reynen Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs, identifying all assets and liabilities of the Reynen Estate as of the

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Reynen Petition Date and other information regarding the Reynen Debtors' financial condition and affairs. Those schedules were amended on June 23, 2009 in order to provide certain corrections and additions.

The Reynen Debtors' Statement of Financial Affairs contains a list of prepetition transfers to insiders within two years of the Reynen Petition Date. Most of those transfers were made as protective measures in order to avoid the imposition of attachment liens sought by creditor/plaintiffs and to preserve the transferred properties for the benefit of all creditors. A chart containing all such transfers, together with additional such transfers identified after the schedules were filed, and containing explanations of the transfers and statements as to intended dispositions, is attached hereto as **Exhibit "I"**. All such transfers have been fully disclosed to the Committee and its professionals.

On October 24, 2008, the Bardis Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs, identifying all assets and liabilities of the Bardis Estate as of the Bardis Petition Date. Those schedules were amended on November 10, 2008.

**E.**     <u>**Representation of the Debtor Group and the Creditors' Committee**</u>

Under applicable provisions of the Bankruptcy Code, the Reynen Debtors, the Bardis Debtors and the Creditors' Committee are entitled to retain professionals, subject to approval by the Bankruptcy Court. Those professionals' compensation and reimbursement of costs must be paid from funds of the Debtor Group's respective Estates and are treated as administrative expenses, unless other arrangements are made with Bankruptcy Court approval. In the Chapter 11 Cases to date, the following professionals have been retained:

       **1.**     <u>**Reynen Debtors' Professionals**</u>

The Reynen Debtors have retained various professionals, including the following: (a) the law firm of Meyers Law Group, P.C. of San Francisco, California, as their general bankruptcy counsel; and (b) the law firm of Wagner Kirkman Klomparens and Youmens LLP, as special corporate and tax counsel.

       **2.**     <u>**Creditors' Committee's Professionals**</u>

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

The Committee has retained the following: (a) the law firm of Orrick Herrington & Sutcliffe, LLP of Sacramento, California, as its general bankruptcy counsel; and (b) the accounting, tax and financial advisory firm of Grant Thornton LLP ("Grant Thornton") as its financial advisor.

### 3. Bardis Debtors' Professionals

The Bardis Debtors have retained the law firm of Meegan, Hanschu & Kassenbrock of Sacramento, California, as their general bankruptcy counsel.

### F. Bar Date for Filing Proofs of Claim

The Bankruptcy Court established September 2, 2008 (the "Reynen Claims Bar Date") as the last date for filing claims in the Reynen Case, and February 23, 2009 (the "Bardis Claims Bar Date") as the last date for filing claims in the Bardis Case. The Debtor Group anticipates that motions will be filed in both cases asking the Bankruptcy Court to set a special bar date for certain possible warranty and construction defect claims, but that date has not yet been established.

### G. Filing of Tax Returns and Receipt of Refunds

On December 31, 2008, each of the Reynen Debtors and the Bardis Debtors, in agreement with the Creditors' Committee, filed State and Federal tax returns for 2006 and 2007, as well as amendments of prior years' returns. The Reynen Debtors' returns indicated substantial refunds owing to the Reynen Estate, and as a result, the Reynen Debtors have received refunds from the Internal Revenue Service, after offsets, in the aggregate, approximate amount of $24,467,000, and the Bardis Debtors' returns also indicated substantial refunds owing to the Bardis Estates, resulting in the Bardies Debtors' receipt of refunds from the Internal Revenue Service, after offsets, in the aggregate, approximate amount of $32,724,000. All such refunds have recently been paid by the Internal Revenue Service to the Debtor Group, as indicated above. Though there can be no certainty, the Debtor Group does not anticipate any significant likelihood of future tax refunds of any material amount being received by either of the estates.

To date, no closing agreement or other arrangement has been reached with any taxing authorities that would resolve any challenges that may be made with respect to such refunds, and under the Plan, except in certain enumerated circumstances, those funds cannot be used for distributions to creditors until any challenge by the Internal Revenue Service has been resolved and

the finality of the refunds has been confirmed. The Internal Revenue Service has declined to close and accept the Debtor Group's entitlements to the Tax Refunds, and insists on reserving the right to challenge the refunds at a later time. Therefore, the Debtor Group intends to file, prior to the Effective Date, a complaint under Section 505 of the Bankruptcy Code seeking declaratory relief resolving and finalizing the Tax Refunds in the amounts already received.

**H.**     **Forbearance Agreements**

During the pendency of the Chapter 11 Cases, the Debtor Group has entered into several forbearance agreements designed to permit the continued funding of SPE projects in order to maximize recoveries by those SPEs' lenders and thereby reduce or eliminate any deficiency liability of the Estates through associated guarantees. Those agreements, in general, permit continued construction or development of projects, provide additional funding by the SPEs' lenders, and limit or eliminate any continuing guarantee liability on the part of the Estates herein. Such forbearance agreements, each of which has been approved by the Bankruptcy Court with the no opposition from the Creditors' Committee, have been reached with KeyBank National Association, Comerica Bank, and JPMorgan Chase Bank.

**I.**     **Motions for Relief from Stay and Deficiency Waivers**

Since the commencement of the Chapter 11 Cases, the Debtor Group has defended against, compromised or otherwise addressed several motions for relief from the automatic stay brought by creditors asserting security interests in assets of the Estates (as distinguished from assets of the SPEs). Those motions have included the following:

On July 10, 2008, Bank of America, N.A. ("Bank of America") brought a motion for relief to foreclose on the Reynen Debtors' primary residence, the Sacramento Property. The Reynen Debtors opposed the motion, and the motion was denied on August 18, 2008.

On August 4, 2008, the Savings Bank of Mendocino ("SBM") moved for relief to foreclose upon a parcel of real property in Mendocino, California known as the White Ranch. The Reynen Debtors negotiated a compromise with SBM whereunder relief would be granted and any deficiency claim against the Reynen Debtors or their Estate would be waived.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Also on August 4, 2008, Umpqua Bank N.A. ("Umpqua") moved for relief to foreclose upon two pieces of property known as Molekumne Oaks and Higgins Ranch. The Reynen Debtors negotiated a compromise with Umpqua whereunder relief would be granted and any deficiency claim against the Reynen Debtors or their Estate would be waived.

On December 10, 2009, First Imperial Capital Bank ("First Imperial") filed a motion for relief from stay to foreclose upon an apartment building at 915 W. Miner Street owned by a partnership in which the Reynen Debtors hold an interest. The Reynen Debtors opposed the motion and the matter was set for trial for March 9, 2009. The Reynen Debtors and First Imperial reached a compromise, which was approved by the Court in March 2009, pursuant to which First Imperial agreed to withdraw its foreclosure sale notice and to restructure the obligations owing to it, allowing the partnership additional time in which to satisfy those obligations and preserve the apartment building.

On November 24, 2008, the Elk Grove Unified School District ("EGUSD") filed a motion for relief from stay to collect delinquent Mello-Roos bond installments related to many parcels of property, all but two of which (the McGregor and 15382 Abierto properties) are not property of either of the Estates, but instead property owned by various entities in which the Reynen Debtors and/or the Bardis Debtors hold interests. By order dated January 15, 2009, the Bankruptcy Court granted EGUSD's motion as to the non-Estate properties, and denied the motion as to the two Estate-owned properties.

## J.     Travelers Casualty Assertion of Secured Claim

On February 23, 2009, Travelers Casualty and Surety Company of America ("Travelers") filed Claim No. 1 (the "Travelers Claim") in the Bardis Case. The Travelers Claim asserts a claim of up to $26,018,351 for alleged indemnification by the Bardis Debtors for losses incurred or to be incurred by Travelers under certain construction-related performance bonds issued by Travelers in connection with SPE projects, and asserts a lien against the Bardis Tax Refunds (and against other unspecified general intangible assets) to secure such claim. On May 19, 2009, Travelers amended its claim in order to assert, among other matters, that the losses incurred to date by Travelers is $2,266,608.73, and that the "not presently contingent" portion of the claim is $3,800,000.00.

The Debtor Group disputes the Travelers Claim, both as to liability and as to lien rights. In

particular, the Debtor Group does not believe that Travelers holds a valid and enforceable lien against the Bardis Tax Refunds. Accordingly, on May 18, 2009, the Debtor Group filed a joint objection to the allowance of the Travelers Claim, and scheduled a hearing thereon for June 23, 2009. The Debtor Group anticipates that this matter will likely be converted into an adversary proceeding, and that the claim and objection will not be resolved prior to the Effective Date. If the Travelers Claim is ultimately allowed as filed, it will have a material, adverse impact upon distributions to general unsecured creditors in the Bardis Case, but not in the Reynen Case. In any event, the Debtor Group believes that the Travelers Claim will ultimately be disallowed, at least as to the assertion of an enforceable lien against the Bardis Tax Refund.

It is noted that no Travelers Claim amount has been included in the calculations of recoveries by creditors of the Bardis Estate under the Plan or under a hypothetical chapter 7 liquidation in Exhibits "D" or "G" attached hereto, given the uncertain, disputed and contingent nature of the claim. However, the Debtor Group does not believe that the Travelers Claim, if quantified for such purposes, would have a material impact on a comparison between Plan recoveries and chapter 7 recoveries, because the outcome of the Travelers Claim and the Debtor Group's recently filed objection would likely be the same under either scenario.

## V. ESTATES' ASSETS AND LIABILITIES

The following is a summary description of the assets and liabilities of the Debtor Group. In most or all cases, stated values are estimated market values that have not been confirmed by any formal appraisals, and are based solely upon the Debtor Group's best estimates. Also, other than contingent claims for contribution and reimbursement with respect to claims on which they are co-debtors, the Debtor Group is not aware of any claims between them. If any such claims do exist, they will be discharged as of the Effective Date pursuant to the terms of the Joint Plan.

**A.**   **Reynen Estate**

The assets and liabilities of the Reynen Estate as of February 28, 2009 are as follows:

**1.**   **Assets:**

•   Reynen Debtors' Cash. The Reynen Debtors hold cash of approximately $26,863,000, of which $24,467,000 represents tax refunds recently received and not yet resolved.

All such cash held as of the Effective Date will be turned over to the Plan Agent for the benefit of the Reynen Estate.

- <u>Reynen Debtors' Real Property</u>.  The Reynen Debtors own, either partially or wholly, the following real property, most of which are encumbered by liens:

  - <u>Sacramento Property</u> – The Reynen Debtors own, through a Qualified Personal Residence Trust, a house located at 2400 E. Tiffany Way, Sacramento, California, which is currently the Reynen Debtors' primary residence.  Merrill Lynch holds first lien encumbering the property in the approximate amount of $1,014,914, and Bank of America holds second lien in the approximate amount of $1,499,898.  The fair market value of the Sacramento Property is estimated to be $2,900,000, and the property is subject to a $150,000 exemption claimed by the Reynen Debtors.  As an Excluded Asset, this property will be revested in the Reorganized Reynens as of the Effective Date.

  - <u>24th Street Property</u> – The Reynen Debtors own investment property located at 3120 24th Street, Sacramento, California.  There is no secured debt encumbering the property, and the approximate value of the property is estimated to be $120,000.  The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

  - <u>Rancho Murrieta Property</u> – The Reynen Debtors own a 50% interest in investment property located at 15382 Abierto Drive, Rancho Murrieta, California.  The Bardis Debtors own the other 50% interest in the Rancho Murrieta Property.  There is no secured debt encumbering the property, and the approximate value of the Reynen Debtors' interest in the Rancho Murrieta Property is estimated to be $80,000.  The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 50% interest in this property for the benefit of the Reynen Estate.

  - <u>Time Share Property</u> – The Reynen Debtors also own a time share interest with respect to property located at 710 Powell Street, San Francisco, California.

There is no secured debt encumbering the interest, and its approximate value is estimated to be $4,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

- o Mendocino Property – The Reynen Debtors own, through a Qualified Personal Residence Trust, a vacation home located at 45134 Brest Road, Mendocino, California. Wells Fargo Home Mortgage holds a security interest in the property, securing a debt in the approximate amount of $2,240,000. The estimated fair market value of the Mendocino Property is estimated to be $2,500,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

- o Tiffany West Property – The Reynen Debtors also own a single family home located at 2821 Tiffany West, Sacramento, California. There is no secured debt encumbering the property, and its approximate fair market value is estimated to be $207,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

- o El Dorado Hills Property – The Reynen Debtors own a single family home located at 397 Maul Oak Court, El Dorado Hills, California. California Bank & Trust holds a secured claim encumbering the El Dorado Hills Property in the approximate amount of $108,000. The estimated fair market value of the property is estimated to be $325,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

- o Pennsylvania Farm Property – The Reynen Debtors own a single family home and rock quarry located at Route T-0554, Hartford, Pennsylvania. PNB holds first and second liens encumbering the property, in the approximate amounts of $123,000, and $269,992, respectively. The estimated fair market value of the Pennsylvania Farm Property is estimated to be $500,000. As an Excluded

Asset, this property will be revested in the Reorganized Reynens as of the Effective Date.

o <u>Pedregal Lot</u> – The Reynen Debtors own an unimproved lot located at Lot 102, Block 17, Cabo San Lucas, Baja, Mexico. The property is held pursuant to a Mexican trust, whose fiduciary is BBVA Bancomer Servicios, SA. There are no secured claims encumbering the property, and the approximate value of the Pedregal Lot, prior to the current downturn, was estimated to be $1,350,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

o <u>Pedregal Vacation Property</u> – The Reynen Debtors own a single family vacation home located at Casa Puesta del Sol, Callejon del Sole Number 440, Lot 13, Block 30, Cabo San Lucas, Baja, Mexico. The property is held pursuant to a Mexican trust, whose fiduciary is BBVA Bancomer Servicios, SA. There are no secured claims encumbering the property, and the approximate value of the property, prior to the current downturn, was estimated to be $1,800,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

• <u>Reynen Debtors Tangible Personal Property</u>. The Reynen Debtors own household goods, vehicles, jewelry, artwork, clothing and other personal items of the Reynen Estate, with a total approximate book value of an estimated $606,000. It should be noted that the amount realizable by the Reynen Estate, however, would be considerably less given the uncertainty of actual present values, particularly in the context of a forced sale without the Reynen Debtors' assistance, and substantial exemption rights asserted by the Reynen Debtors would further limit the Reynen Estate's recovery, if any. As Excluded Assets, these properties will be revested in the Reorganized Reynens as of the Effective Date.

- <u>Reynen Debtors Accounts Receivable, Entity Interests and Other General Intangibles</u>. The Reynen Debtors own accounts receivable and other general intangible personal property having an unknown aggregate value. Among those assets are the following:

  o <u>Reynen Atwood Interest</u> – The Reynen Debtors own a 50% interest in Atwood Partners, with the Bardis Debtors owning the other 50% interest. Atwood Partners owns an account receivable dependent upon other parties acquiring business permits to develop certain land. Whether and when such permitting will occur is uncertain at best, and therefore, the value of the interest is not presently known. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

  o <u>Nichols Ranch Interest</u> – The Reynen Debtors own a 21% ownership interest in Nichols Ranch Limited Partnership. The approximate value of that interest is not presently known. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

  o <u>R&B Land Investments (Nevada) Interest</u> – The Reynen Debtors own a 50% interest in R&B Land Investments (Nevada), with the Bardis Debtors owning the other 50% interest. The value of that interest is unknown, but not expected to be material. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

  o <u>R&B Parella</u> - The Reynen Debtors own a 50% interest in R&B Parella, with the Bardis Debtors owning the other 50% interest. R&B Parella owns an account receivable dependent upon other parties acquiring business permits to develop certain land. Whether and when such permitting will occur is uncertain at best, and therefore, the value of the interest is not presently known. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 50% interest in this property for the benefit of the Reynen Estate.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

o     <u>Reynen 1215 D St. Interest</u> – The Reynen Debtors own a 12.765% interest in 1215 D Street, which is a limited partnership. The Bardis Debtors also own a 12.765% interest in this partnership. The approximate value of the Reynen Debtors' interest is estimated to be $10,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 12.675% interest in this property for the benefit of the Reynen Estate.

o     <u>Reynen 2517 C St. Interest</u> – The Reynen Debtors own a 50% interest in 2517 C Street, which is a limited partnership. The Bardis Debtors also own a 50% interest in this partnership. The approximate value of the Reynen Debtors' interest is estimated to be $94,171. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 50% interest in this property for the benefit of the Reynen Estate.

o     <u>Reynen 2410 C Street Interest</u> – The Reynen Debtors own a 41.67% interest in 2410 C Street, which is a limited partnership. The approximate value of the Reynen Debtors' interest is estimated to be $54,370. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 41.67% interest in this property for the benefit of the Reynen Estate.

o     <u>Reynen Antelope Greens Interest</u> – The Reynen Debtors own a 25% interest in Antelope Greens, a joint venture. The Bardis Debtors also own a 25% interest in this joint venture. The approximate value of the Reynen Debtors' interest is estimated to be $210,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 25% interest in this property for the benefit of the Reynen Estate.

o     <u>Reynen Castle Park Interest</u> - The Reynen Debtors own a 25% interest in Castle Park LLC. The Bardis Debtors also own a 25% interest in the entity. The approximate value of the Reynen Debtors' interest is estimated to be $50,000. The Plan Agent will be responsible for the sale or other disposition

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

of the Reynen Estate's 25% interest in this property for the benefit of the Reynen Estate.

- o  Reynen Conway Interest – The Reynen Debtors own, indirectly a 27.54% interest in Conway Preservation Group LLC. The approximate fair market value of the Reynen Debtors' interest is estimated to be $500,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's 27.54% interest in this property for the benefit of the Reynen Estate.

- o  Reynen Wilcox Canyon Interest – The Reynen Debtors own 100% of Wilcox Holdings, LLC (NV). The approximate value of the Wilcox Canyon Interest is estimated to be $3,145,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

- o  Town Square Associates – The Reynen Debtors own a 50% interest in Town Square Associates, a limited partnership. The Bardis Debtors also own a 50% interest in the entity. The approximate fair market value of the Reynen Debtors' interest is estimated to be $137,500. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate

- o  GSB Development Note Receivable – The Reynen Debtors own a 100% interest in a note receivable owing from GSB Development. The approximate amount of the GSB Development note receivable is estimated to be $1,260,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's interest in this receivable for the benefit of the Reynen Estate.

- o  Carol Hampton Note Receivable – The Reynen Debtors own a 100% interest in a note receivable owing from Carol Hampton. The approximate amount of the Carol Hampton note receivable is estimated to be $500,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's interest in this receivable for the benefit of the Reynen Estate.

o   <u>Wallace Lake Estates Interest</u> – The Reynen Debtors own a 100% interest in Wallace Lake Estates. The approximate value of this interest is estimated to be $350,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

o   <u>Reynen CH (Loomis) Interest</u> – The Reynen Debtors own a 12.5% interest in CH (Loomis), which is a limited partnership. The Bardis Debtors also own a 12.5% interest in this partnership. The approximate value of the Reynen interest in this entity is estimated to be $65,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's interest for the benefit of the Reynen Estate.

o   <u>Pinnacle Land Ventures Interest</u> – The Reynen Debtors own 100% of Pinnacle Land Ventures, LLC (DE), Series E. The approximate value of this interest is estimated to be $2,250,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

o   <u>Domina Holdings Interest</u> – The Reynen Debtors own 100% of Domina Holdings, LLC (DE). The approximate value of this interest is estimated to be $1,400,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

o   <u>Auctor Villas Interest</u> – The Reynen Debtors own 100% of Auctor Villas, LLC (DE). The approximate value of this interest is estimated to be $225,000. The Plan Agent will be responsible for the sale or other disposition of this property for the benefit of the Reynen Estate.

o   <u>John Reynen Life Insurance</u> – The Reynen Debtors own two whole-life insurance policies issued by Guardian Life Insurance Company of America, one for John Reynen, which has an estimated cash surrender value of $241,000, and the other for Judy Reynen, which has an estimated cash surrender value of $16,000. The Plan Agent will be responsible for the sale or other disposition of those policies for the benefit of the Reynen Estate.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

o     <u>KMS Happy Lane L.P.</u> - The Reynen Debtors own a 38.095% interest in KMS Happy Lane L.P., a California limited partnership that, in turn, owns commercial and industrial property. The approximate value of the Reynen Estate's 38.095% interest is estimated to be $822,000. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's interest for in this property the benefit of the Reynen Estate.

o     <u>Pine Gardens (Miner Street) Interest</u> – The Reynen Debtors own approximately 50% of the Pine Gardens (Miner Street) partnership. Pine Gardens (Miner Street) owns an apartment building in Yreka, California, which is encumbered by a loan held by First Imperial Capital Bank. It is unknown what the approximate value of the property is at this time, though the Reynen Debtors do believe there is equity in the property. The Plan Agent will be responsible for the sale or other disposition of the Reynen Estate's interest for in this property the benefit of the Reynen Estate.

2.    <u>**Liabilities:**</u>

- <u>Reynen Administrative Claims</u>. The Reynen Debtors estimate that allowed and unpaid administrative expenses to be incurred through the period prior to the confirmation of the Plan will total approximately $900,000 in the aggregate, including professional fees earned by the Debtors' and the Committee's counsel and the Committee's financial advisors.

- <u>Reynen Secured Claims</u>. Secured claims consist of those described in relation to the Estate assets identified above.

- <u>Reynen Priority Claims</u>. The Reynen Debtors expect approximately $224,000 of priority claims to be Allowed Claims that will be paid in full.

- <u>Reynen Unsecured Claims</u>. General unsecured claims held against the Reynen Estate include substantial contingent obligations arising from guarantees of the SPEs' debts, and their quantification depends largely on the outcome of SPEs' projects and their lenders' recoveries. The Reynen Debtors estimate that the aggregate amount of

allowable general unsecured claims under the Plan, within Class D1, will be in an approximate range between $535,321,000 and $764,655,000. In the event of liquidation under chapter 7, however, the Reynen Debtors believe that the aggregate amount of such claims is more likely to be in an approximate range between $632,867,000 and $816,938,000. It is noted, however, that those amounts are estimates only, and the actual outcome of claims may vary widely from those estimates.

**B.** **Bardis Estate**

The assets and liabilities of the Bardis Estate as of February 28, 2009 are as follows:

**1.** **Assets:**

- Bardis Debtors' Cash. The Bardis Debtors hold cash of approximately $32,750,000, of which $32,724,000 represents tax refunds recently received and not resolved. All such cash held as of the Effective Date will be turned over to the Plan Agent for the benefit of the Bardis Estate.

- Bardis Debtors' Real Property. The Bardis Debtors own, either partially or wholly, the following real property, most of which are encumbered by liens:

  o Gold River Property – The Bardis Debtors own a single family home located at 11375 Huntington Village, Gold River, California, which is currently the Bardis Debtors' primary residence. Wachovia has a security interest in the Gold River Property in the amount of $420,144, Bank of the West asserts an attachment lien junior thereto, BankFirst and First Tennessee may also assert junior attachment liens, and the Bardis Debtors claim homestead exemption rights with respect to the property. The estimated fair market value of the Gold River Property is $550,000. Accordingly, it is estimated that there is no equity in the approximate Gold River Property from the perspective of the Bardis Estate. The property is an Excluded Asset, and under the Plan, the property will revest in the Reorganized Bardises subject to existing liens and the Reorganized Bardises' right to seek to avoid, disallow or modify the

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

aforementioned writ of attachment pursuant to Bankruptcy Code Section 522(f) or any other provision of law.

- o <u>Los Angeles Property</u> – The Bardis Debtors own a single family home located at 7551 Coastal View Drive, Los Angeles, California. Wachovia Bank, N.A. has a security interest in the property in the approximate amount of $2,366,868. The estimated fair market value of the property is $1,700,000. Therefore, there is no equity in the property. Under the Plan, Wachovia Bank will be permitted to foreclose upon the property.

- o <u>Greece Property</u> – The Bardis Debtors own a single family home in Kastanitsas, Greece. There are no secured claims against the Greece Property, and the approximate value of the Greece Property is $75,000. As an Excluded Asset, this property will be revested in the Bardis Debtors as of the Effective Date.

  - o <u>Rancho Murieta Property</u> – The Bardis Debtors own 50% of an investment property located at 15382 Abierto Drive, Rancho Murieta, California. The Reynen Debtors own the other 50% of the property. There is no secured debt presently pending against this property, and the approximate value of the Bardis Debtors' interest in the property is $80,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 50% interest in this property for the benefit of the Bardis Estate.

- • <u>Bardis Debtors Tangible Personal Property</u>. The Bardis Debtors owned household goods, vehicles, jewelry, artwork, clothing and other personal items of the Bardis Estate, with an estimated, approximate cost of $620,000. It should be noted that the amount realizable by the Bardis Estate, however, would be considerably less given the uncertainty of actual present values, particularly in the context of a forced sale without the Bardis Debtors' assistance, and substantial exemption rights asserted by the Bardis Debtors would further limit the Bardis Estate's recovery, if any. As Excluded Assets, these properties will be revested in the Reorganized Bardises as of the Effective Date.

- **Bardis Debtors Accounts Receivable, Entity Interests and Other General Intangibles.** The Bardis Debtors own general intangible personal property having an unknown aggregate value. Among those assets are the following:

  - Bardis Atwood Interest – The Bardis Debtors own a 50% interest in Atwood Partnership, with the Reynen Debtors owning the other 50% interest. Atwood Partnership owns a receivable based on other parties acquiring business permits to develop land. As it is impossible to predict when and if the parties will choose to develop the land, the value of this receivable cannot be estimated at this point. It is likely that the receivable will not return any funds for ten years or more. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 50% interest in this property for the benefit of the Bardis Estate.

  - Bardis 1215 D St. Interest – The Bardis Debtors own a 12.765% interest in 1215 D Street, which is a limited partnership. The Reynen Debtors also own a 12.765% interest in this partnership. The approximate value of the Bardis Debtors' interest is $10,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 12.675% interest in this property for the benefit of the Bardis Estate.

  - Bardis 2517 C St. Interest – The Bardis Debtors own a 50% interest in 2517 C Street, which is a limited partnership. The Reynen Debtors also own a 50% interest in this partnership. The approximate value of the Bardis Debtors' interest is $94,171. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 50% interest in this property for the benefit of the Bardis Estate.

  - Bardis Antelope Greens Interest – The Bardis Debtors own a 25% interest in Antelope Greens, which is a joint venture. The Reynen Debtors also own a 25% interest in this joint venture. The approximate value of the Bardis Debtors' interest is $210,000. The Plan Agent will be responsible for the sale

or other disposition of the Bardis Estate's 25% interest in this property for the benefit of the Bardis Estate.

- o <u>Castle Park Interest</u> – The Bardis Debtors own a 25% interest in Castle Park LLC. The approximate value of the Bardis Debtors' interest is $50,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 25% interest in this property for the benefit of the Bardis Estate.

- o <u>Cypress Interest</u> – The Bardis Debtors own a 34% interest in Cypress GC, LLC. The approximate value of the Bardis Debtors' interest is $1,428,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's 34% interest in this property for the benefit of the Bardis Estate.

- o <u>C&S Interest</u> – The Bardis Debtors own a 25% interest in the C&S Partnership, which interest is estimated to have an approximate fair market value of $243,750. As an Excluded Asset, the Bardis Debtors' interest in C&S will be revested in the Reorganized Bardises as of the Effective Date.

- o <u>Bardis CH (Loomis) Interest</u> – The Bardis Debtors own a 12.5% interest in CH (Loomis), which is a limited partnership. The Reynen Debtors also own a 12.5% interest in this partnership. The approximate value of this interest is estimated to be $65,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's interest in this property for the benefit of the Bardis Estate.

- o <u>Townsquare Associates Interest</u> – The Bardis Debtors own a 50% interest in Townsquare Associates, which is a limited partnership. The Reynen Debtors also own a 50% interest in this partnership. The approximate value of this interest is $138,000. The Plan Agent will be responsible for the sale or other disposition of the Bardis Estate's interest in this property for the benefit of the Bardis Estate.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

o   <u>Private Club Memberships</u> – The Bardis Debtors also own two private club memberships: a Monterey Peninsula Club membership, which is valued at $112,500, and a Del Paso Country Club membership, which is valued at $25,000. The Del Paso Country Club imposes strict requirements for transferring memberships that would likely render that particular membership valueless in liquidation. Under the Plan, the Bardis Debtors will retain the memberships as Excluded Assets.

## 2. <u>Liabilities</u>:

- <u>Bardis Administrative Claims</u>. The Bardis Debtors estimate that allowed and unpaid administrative expenses to be incurred through the period prior to the confirmation of the Plan will total approximately $550,000 in the aggregate, including professional fees earned by the Bardis Debtors' counsel and allocated portions of fees earned by the Reynen Debtors' counsel and the Committee's counsel and the Committee's financial advisors.

- <u>Bardis Secured Claims.</u> Secured claims consist of those described in relation to the Estate assets identified above.

- <u>Bardis Priority Claims</u>. The Bardis Debtors expect approximately $1,450,000 in priority claims to be Allowed Claims that will be paid in full.

- <u>Bardis Unsecured Claims</u>. General unsecured claims held against the Bardis Estate include substantial contingent obligations arising from guarantees of the SPEs' debts, and their quantification depends largely on the outcome of the SPEs' projects and their lenders' recoveries. The Bardis Debtors estimate that allowable general unsecured claims under the Plan, within Class D1, will be in an approximate range between $613,021,000 and $879,786,000. In the event of liquidation under chapter 7, however, the Bardis Debtors believe that the aggregate amount of such claims is more likely to be in an approximate range between $662,394,000 and $907,973,000. It is noted, however, that those amounts are estimates only, and the actual outcome of claims may vary widely from those estimates.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

# VI.    CONFIRMATION AND CONSUMMATION PROCEDURE

## A.    Solicitation of Votes

In accordance with the provisions of Sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes B1.2, B1.3, B1.4, B1.5, B1.6, B1.7, B1.8, B1.9, B1.10, B1.11, B2,5, B2.6, B2.7, C1, C2, D1 and D2 are impaired and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan. The holders of Allowed Claims in Classes A1, A2, B1.1, B1.12, B2.1, B2.2, B2.3, B2.4, B2.8 and B2.9 are unimpaired, and are conclusively presumed to have accepted the Plan and therefore are not entitled to vote, under Section 1126(f) of the Bankruptcy Code.

As to those classes of Claims entitled to vote to accept or reject the Plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount, and one-half in number, of the claims of that class that have timely voted to accept or reject a plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor of an impaired Class (i) whose Claim has been listed by the Debtor Group in their schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of claim within any applicable period of limitations, or with leave of the Bankruptcy Court, which Claim is not the subject of an objection, is entitled to vote to accept or reject the Plan.

## B.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Confirmation Hearing with respect to the Plan will be conducted before the Honorable Christopher M. Klein, United States Bankruptcy Judge at the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, 6th Floor, Courtroom 35, Sacramento, California, on a date and time set forth in documents accompanying this Disclosure Statement. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for an announcement of the continued date made at the Confirmation Hearing.

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA  94104

Section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served upon those parties identified for such service in other documents accompanying this Disclosure Statement. Objections to confirmation of the Plan are governed by Bankruptcy Rules 3017 and 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, THE BANKRUPTCY COURT MAY NOT CONSIDER IT.**

## C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. In order to be confirmed, the Plan must meet all confirmation requirements from the perspective of each Estate, as if set forth in separate reorganization plans in each of the Chapter 11 Cases. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors which are impaired under the plan.

### 1.    Acceptance:

As stated, Claims within Classes B1.2, B1.3, B1.4, B1.5, B1.6, B1.7, B1.8, B1.9, B1.10, B1.11, B2.5, B2.6, B2.7, C1, C2, D1 and D2 of the Plan are impaired under the Plan and are entitled to vote to accept or reject the Plan. The Debtor Group reserves the right to seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any Class of Claims that rejects or is deemed to reject the Plan.

### 2.    Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

       a.    **Secured Creditors.** Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

LAW OFFICES

**MEYERS LAW GROUP, P.C.**

44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph.

**b.** <u>**Unsecured Creditors.**</u> Either (i) each impaired unsecured creditor receives or retains under the plan property of value equal to the amount of its allowed claim or (ii) the holders of claims that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

**c.** <u>**Interests.**</u> Either (i) each holder of an interest in the Estates will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtor Group believes that the Plan and the treatment of all Classes of Claims under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### 3. <u>Feasibility</u>

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. Because the Plan provides for an orderly liquidation of Estate assets, the Debtor Group submits that there is no material issue as to feasibility.

### 4. <u>Best Interests of Creditors</u>

With respect to each impaired Class of Claims, confirmation of the Plan requires that each holder of a Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the debtors' assets were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims of each impaired Class would receive if the debtors' assets were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from that liquidation in the context of a chapter 7 liquidation case. The cash amount which would be available for

satisfaction of unsecured claims would consist of the proceeds resulting from the disposition of the unencumbered assets of the estate, augmented by the unencumbered cash held by the chapter 7 trustee at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

In Reynen Case and the Bardis Case, the Debtor Group believes that the Plan is likely to produce a greater and prompter recovery for general unsecured creditors than chapter 7 liquidations of the two Estates. Attached hereto as **Exhibits "C" and "D"** is the Debtor Group's analysis of the probable outcomes of distributions under the Plan and, in the alternative, chapter 7 liquidations in the two cases. As can be seen from a review of that analysis, it is the Debtor Group's belief that general unsecured creditors would receive distributions of between approximately 0.9% and 2.3% in the Reynen Case in a chapter 7 liquidation, and that general unsecured creditors would receive distributions of between approximately 0.9% and 2.2% in the Bardis Case in a chapter 7 liquidation. This is contrasted with roughly ranges of 2.8% - 6.1% and 2.2% - 5.2%, respectively, expected in distributions to general unsecured creditors under the terms of the Plan. By those estimations, recoveries will be greater under the Plan and the best interests test is satisfied.

The principle reason for the difference in outcomes in chapter 7 and under the Plan is the level of cooperation and assistance to which the Reynen Debtors and the Bardis Debtors have committed under the Plan, which assistance efforts would not be required of them in chapter 7 liquidations. Those assistance efforts are expected to benefit the Estates under the Plan in several respects, including the following:

First and foremost, the Debtor Group has agreed to actively prosecute the tax returns recently filed by them on behalf of the Estates, and to defend the substantial refunds recently obtained thereby. The returns, and hence the resulting refunds, are complex and depend upon exhaustive analyses, valuations and estimations of the assets and operations of more than one hundred SPEs, for which the Debtor Group and its Buildco staff has intimate familiarity, and without the Debtor Group's active assistance, it is believed that the outcome of those returns and refunds might be substantially less favorable to the Estates. Therefore, recoveries by unsecured creditors under the

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

1  Plan are expected to be significantly enhanced by the Debtor Group's assistance in obtaining and

2  retaining the expected tax refunds. Most importantly, the Tax Refund is almost entirely dependent on

3  the Debtor Group's defense and the continued efforts by Buildco. If the Estates are liquidated in

4  chapter 7 cases at this point, whereas the Debtor Group would fulfill their statutory duties in

5  cooperating in the chapter 7 trustee's defense of the tax refunds in response to a challenge by the

6  Internal Revenue Service, it is not anticipated that the level of support by the Debtor Group,

7  uncompensated and necessarily secondary to new, income-producing ventures of the Debtor Group,

8  would be as helpful. Moreover, with the dissolution of Buildco, Inc. and the loss of its staff and its

9  great familiarity with the tax returns, the chapter 7 trustee's challenges in defending the tax refunds

10 would be dramatically increased. In that event, for lack of the same support for its defense, the

11 Reynen Tax Refund might be dramatically reduced by challenges by the IRS, possibly to the lesser

12 amount of $6.9 million, and that the Bardis Tax Refund might also be dramatically reduced, possibly

13 to the lesser amount of $10.5 million. On the other hand, the Debtor Group believes that under the

14 Plan, with the Reorganized Debtors' active defense of the refunds, the final sustainable amounts of

15 refunds will be much greater, up to the presently held amounts of $25.9 million and $34.7 million,

16 respectively, as it is the Debtor Group's belief that those refund amounts are defensible and

17 appropriate.

18     Second, the continued, limited operations of Buildco under the terms of the Plan are expected

19 to substantially reduce the potential claims against the Estates by completing construction of selected

20 projects, maximizing recoveries of the SPEs' lenders through those build-outs, and thereby

21 decreasing the potential deficiencies, and hence claims against the Estates under personal guarantees,

22 realized by those lenders. These reductions in claims are expected to arise from both completion of

23 construction projects and the Debtor Group's assistance in reviewing and resolving claims that are

24 disputed or that arise from guaranteed deficiencies.

25     Third, the Debtor Group has agreed to provide substantial assistance to the Plan Agent in the

26 marketing and sale of the Estates' assets, consisting primarily of parcels of real property. Here too,

27 the Debtor Group is most familiar with those properties and their sales features, and it is anticipated

28 that the Debtor Group's input and assistance to the Plan Agent will result in prompter and better

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

recoveries for general unsecured creditors. In a liquidation, the Debtor Group believes that its assets would be sold for less, and because most of the Debtor Groups' assets are encumbered by liens, sales of collateral at distressed prices would likely leave little surplus after secured debt, and therefore, less funds would be available to distribute to holders of general unsecured claims.

The Debtor Group's assistance to the Plan Agent will be compensated in various manners as described above. It is the Debtor Group's belief that even after taking into account those forms of compensation, the Estates will be materially benefited from the Debtor Group's promised efforts, resulting in a better outcome under the Plan than in chapter 7 liquidations. This is the conclusion reached by the Creditors' Committee as well, after having negotiated exhaustively with the Debtor Group with respect to the particulars of promised assistance and the levels and calculations of compensation.

For these reasons, the Debtor Group believes that the Plan will produce a better and quicker recovery for creditors than chapter 7 liquidations, and that the "best interests" test described above is therefore satisfied by the terms of the Plan.

**D.**     **Consummation**

The Plan will be consummated following the Effective Date, which will be a date shortly following entry of the Confirmation Order, absent a stay of implementation.

**E.**     **Effect of Confirmation of the Plan**

Confirmation and effectuation of the Plan will bind the Debtor Group, all creditors and all other parties in interest to the provisions of the confirmed Plan, whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan. Nothing contained in the Plan will limit the effect of Confirmation as described in Section 1141 of the Bankruptcy Code.

## VII.     CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE REYNEN DEBTORS OR THE BARDIS DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER**

HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A. Certain Bankruptcy Law Considerations

### 1. Risk of Non-Confirmation of the Plan

Although the Debtor Group believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate the resolicitation of votes.

### 2. Non-Consensual Confirmation

In the event one or more impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor Group's request, if all other conditions for confirmation have been met and at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired Class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes. The Debtors believe that the Plan satisfies those requirements.

### 3. Tax Attributes of the Plan

Neither the Debtor Group nor the Creditors' Committee will seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## B. Certain Practical Considerations

### 1. Failure to Retain Tax Refunds

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

MEYERS LAW GROUP, P.C.
LAW OFFICES
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

Although the Debtor Group has recently received the substantial tax refunds described above, there is no assurance that significant portions thereof may not be reclaimed by the Internal Revenue Service. The Debtor Group has not yet received any formal reaction from any taxing authorities regarding the refunds, and therefore cannot predict the likelihood of disputes and litigation regarding the refunds. If the refunds are significantly reduced, recoveries by general unsecured creditors will be adversely affected.

### 2.     **Failure of R&B's Operations**

There is a risk that the operations of Buildco will fail, or will not produce the results anticipated in terms of construction completion and reductions of deficiency claims, either because of lack or insufficiency of funding, failure of agreements with the SPEs' lenders or other contingent events. In that event, which the Debtor Group does not expect, claims against the Estates will be increased and recoveries by general unsecured creditors, on a percentage basis, will be reduced. There is, of course, the risk that the Debtors' buildout operations will not succeed in achieving the results expected. In that event, which the Debtors consider unlikely, the Debtor Group will continue to try to minimize deficiency claims. The Debtor Group will further continue to negotiate with their prepetition lenders to reduce claims owed by each Estate. However, there is no guarantee that after the projects are built out the deficiency claims will be reduced to the extent anticipated by the Debtor Group.

### 3.     **Estimated Amounts**

The valuations provided on the Debtor Group's schedules were based on the estimates of the Debtor Group, as well as the staff at R&B, based on their extensive knowledge of the real estate market. Those estimates are a reflection of the Debtors' best subjective valuation at the time. It should be noted that the bulk of the Debtors' real property assets are located in Sacramento and the Sacramento area. In October 2008, the median sales price in the Sacramento area fell below $200,000 for the first time since April 2002. Some experts expect the values to continue to decline, while at the same time increasing the number of homes sold. With this wide-ranging volatility, it is difficult to predict what the values will be at the time of the sale of Estate assets. Furthermore, the liquidation value of real property is generally below fair market value, further compounding the

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

ability to accurately determine the value of the Debtors' real property assets.

In light of the volatile real estate market, declining home values and the discounted value for a liquidation sale, all creditors and parties in interest should be aware that the amounts received for the sale of the Debtors' real property assets could significantly vary the values listed on the Debtors' schedules and the estimates provided in the Plan and this Disclosure Statement.

### 4. Contested Claims

If the Plan Agent and the Reorganized Debtors are unsuccessful in their objections to contested and contingent Claims that have been filed against the Estates, the total liabilities will be greater than expected. The Plan Agent and the Reorganized Debtors intend to vigorously oppose the allowance of all Claims that they believe are either entirely or in part without merit. However, if the Plan Agent's or the Reorganized Debtors' objections are not upheld by the Bankruptcy Court, and these Claims are allowed in amounts in excess of the amounts that have been accrued by the Debtor Group, the total liabilities of the Estates will be greater than expected, and there will be less cash than expected available for distribution to creditors.

### 5. Liquidation Analysis

The Debtor Group has prepared hypothetical chapter 7 liquidation analyses attached as the second halves of **Exhibits "C" and "D"** to assist Claimants holding impaired claims to reach their determination as to whether to accept or reject the Plan. Underlying the liquidation analyses are a number of estimates and assumptions that, although developed and considered reasonable by the Debtor Group and the management of Buildco, are inherently subject to economic uncertainties and contingencies beyond the control and knowledge of the Debtor Group. It is noted that the Creditors' Committee's financial advisor assisted the Debtor Group in the preparation of **Exhibits "C" and "D,"** particularly as to methodology and format, but that the assumptions and estimated amounts contained in those analyses are solely those of the Debtor Group and Buildco, Inc.

Accordingly, there can be no assurance that the values assumed in the liquidation analyses would be realized if the Estates were liquidated under chapter 7. In addition, any liquidation that would be undertaken would necessarily take place in future circumstances which cannot currently be predicted. Therefore, while the liquidation analyses are necessarily presented with numerical

DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
23091/20014

specificity, if the Estates were liquidated under chapter 7, the actual liquidation proceeds could vary, perhaps substantially, from the amounts set forth in **Exhibits "C" and "D."** No representation or warranty can be or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation. Nothing contained in the liquidation analyses is intended or may constitute a concession or admission of the Debtor Group for any other purpose.

## VIII. <u>CONCLUSION AND RECOMMENDATION</u>

Based upon the foregoing, the Debtor Group, with the support of the Creditors' Committee, believes that confirmation and implementation of the Plan is in the best interests of all creditors, and should therefore be accepted by all classes of creditors.

DATED: May 29, 2009

___/s/ John D. Reynen_____  ___/s/ Christo Bardis_____
  JOHN D. REYNEN, Debtor     CHRISTO BARDIS, Debtor

___/s/ Judith M. Reynen_____  ___/s/ Sara Bardis_____
  JUDITH M. REYNEN, Debtor    SARA BARDIS, Debtor

Approved and submitted by:

MEYERS LAW GROUP, P.C.    MEEGAN, HANSCHU & KASSENBROCK
Merle C. Meyers, Esq., CA Bar #66849  David M. Meegan, Esq., CA Bar #114549
Edie Walters, Esq., DC Bar #474033
Michele Thompson, CA Bar #241676

By: ___/s/ Merle C. Meyers_____  By: ___/s/ David M. Meegan_____
   Merle C. Meyers, Esq.      David M. Meegan, Esq.
   Attorneys for Reynen Debtors    Attorneys for Bardis Debtors

LAW OFFICES
**MEYERS LAW GROUP, P.C.**
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104